E-FILED
Wednesday, 21 April, 2021  03:54:42 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| WENDY KELLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-04078-SLD-JEH |
| | ) | |
| THE PROJECT OF THE QUAD CITIES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant The Project of the Quad Cities, Inc.'s ("The Project")

Motion for Summary Judgment, ECF No. 17. For the following reasons, the motion is

GRANTED to the extent it seeks judgment on Plaintiff Wendy Kelly's claim that her termination

constitutes race discrimination.

## BACKGROUND[1]

### I.    Position and Job Responsibilities

Kelly is African American. In 2004, she was hired by The Project, a not for profit

corporation. She became the executive director of The Project in 2008 and held that position

until April 20, 2017. In this role, she served under the direction of The Project's board of

directors ("the board"); she was the only employee of The Project who answered directly to the

board. She was responsible for agency development, growth and sustainability planning, and

---

[1] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Unless otherwise noted, the factual background of this case is drawn from The Project's statement of undisputed material facts, Def.'s Mot. Summ. J. 2–13; Kelly's statement of disputed material facts and additional material facts, Pl.'s Resistance Mot. Summ. J. 2–10, ECF No. 18; The Project's reply to Kelly's additional material facts, Def.'s Reply 1–4, ECF No. 19; and exhibits to the filings.

development of prevention and care programs, in addition to her general duties to oversee the

agency and supervise The Project's employees.

As executive director, Kelly initially earned a yearly salary of $44,000; at the time her

employment ended, she was earning $62,000 per year, in addition to a biweekly milage

allowance of $400.  During the final year of her employment, she requested that her salary be

increased to $72,000 but instead received a five percent raise.  At the same time that she received

this raise, the board capped raises for all other non-grant employees at three percent.  Kelly never

had an employment contract and stated that she believed she could be fired at any time.

Kelly was responsible for hiring and firing employees.  In 2015, she wrote procedures for

firing employees, which, she testified, were utilized "[t]o the best of ability."  Kelly Dep. 20:8–

11, Def.'s Mot. Summ. J. Ex. 1, ECF No. 17-1.  She also developed a discipline structure and

took part in disciplining and reprimanding employees along with Kristina Hall, the director of

operations, and Thea Hansen, the director of grants and services.

## II.    Allegedly Racially Insensitive Statements

In early 2016, The Project developed a strategic plan.  A PowerPoint slide deck was

created as a part of this process, incorporating written statements from board members.  A slide

bearing the heading "Most Significant Weaknesses" contained a bullet point that read:

> Staff still seems to have a slightly adversarial relationship with the Board.  The
> Board is now full of competent, professional people, many of whom are not a part
> of "the community".  This is actually an advantage[—]if harnessed, the collective
> expertise of this Board is capable of drastically changing the impact the Agency
> has in the larger QC community.  We have to find a way to move away from the
> ghetto-ized perception that just isn't a reality in 2016.

Strategic Planning PowerPoint 4, Def.'s Mot. Summ. J. Ex. 2, ECF No. 17-2.  At a strategic

planning meeting, Kelly commented that she believed this statement to be racist.  Board member

Sarah Stevens admitted that she wrote the statement and said that "she didn't mean it like that." Kelly Dep. 37:22–38:7.

Kelly met with Laura Kopp, another board member, in November of 2016. At that time, Kelly had natural hair and was wearing it down; she testified that "[i]t was kind of fuzzed out and a very natural look." *Id*. at 81:20–82:2. Kopp asked her, "That's the best you can do with that?" *Id*. at 81:21–22. Kelly did not inform Kopp or any other board member that this conversation made her uncomfortable.

### III.     Termination

In November 2016, Kelly purchased tires using a company credit card. She states that the use of the company credit card was unintentional and that she had intended to use a personal credit card instead; charging personal purchases to a company credit card is against the policies of The Project. Approximately a week and a half after the purchase, Kelly became aware that the company credit card had been charged, and in early December 2016, she informed Kopp of the situation. Kopp responded by telling her that she needed to pay the money back. Kelly states that on January 30 or 31, 2017, she gave five $100 bills to Hall to reimburse The Project for the purchase, plus interest. By that time, The Project had paid its credit card statement, which included the tire purchase.

An emergency board meeting was called in February of 2017 to discuss the situation. The board agreed to hire Bill Stengel and Casey Stengel to perform an audit, which found that Kelly had used a company credit card to make the tire purchase and had only later paid the agency back. A second board meeting was held in April of 2017. At that meeting, the board again discussed Kelly's actions and deliberated on whether to terminate her or take other disciplinary action. At one point during the discussion, board member Bernadette McCowan—

3

the only African American board member—left for the bathroom.  When she exited the room, disciplinary actions short of termination were being considered; when she returned, a motion for termination had been set.  Every board member voted to terminate Kelly except for McCowan, who thought that this result was not warranted based on the information presented to her, and Thomas Schmits, who chose not to vote because he had not been present at the first meeting. Because Kopp wanted a unanimous vote, a second vote was taken; McCowan again voted no.

McCowan later told Kelly that she believed that the board's decision to terminate her was racially motivated; she felt as though several discussions had taken place outside of her presence. She has neither heard anything nor received documentation to support the idea that the decision to terminate Kelly was racially motivated.

On April 20, 2017, Bill Stengel met with Kelly and presented her with two options: she could sign a document resigning from her job, or she could sign another document and be fired. Kelly asserts that she was told that she knew why she was being asked to resign.  She was aware of the investigation but states that she did not know whether the demand to either resign or be terminated was related to the investigation.  Kelly signed the document resigning from her position as executive director.  The document also contained a handwritten provision stating "I, Wendy Kelly am unsure why I am being asked to resign.  I have not been informed of any allegations brought against me."  Resignation, Def.'s Mot. Summ. J. Ex. 7, ECF No. 17-7.  Kelly testified that she felt forced to sign the resignation document because—as it was presented to her—her community reputation would have been tarnished if she had signed the other document and been fired.  On April 28, 2017, she emailed Donald Yule, an accountant whose company worked with The Project, stating that, although she was not sure why she had been asked to resign, she had a feeling it was over a charge made on the company credit card.

After Kelly resigned, Andrea Meirick was hired as executive director of The Project. Meirick, who was Caucasian, received a base salary of $80,000.

## IV.    Procedural History

Kelly filed suit against The Project on April 11, 2019, bringing claims for race discrimination in employment in violation of 42 U.S.C. § 1981 (Count I) and breach of an employment agreement (Count II).  Compl. 1–5, ECF No. 1.  On August 2, 2019, the Court dismissed Count II with prejudice.  Aug. 2, 2019 Order 4, ECF No. 8.  The Project moved for summary judgment as to the § 1981 claim on January 15, 2021.  Def.'s Mot. Summ. J. 1–2.

## DISCUSSION

## I.    Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where one party has properly moved for summary judgment, the nonmoving party must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Parties may not merely refer to their own pleadings, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but must instead "cit[e] to particular parts of materials in the record, including depositions, documents, [and] . . . affidavits or declarations" or show "that the materials cited do not establish the absence or presence of a genuine dispute," Fed R. Civ. P. 56(c)(1).[2]  The court is to "constru[e] the record

_____

[2] "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

5

in the light most favorable to the nonmovant," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.

2003), "resolving all factual disputes and drawing all reasonable inferences in favor of [the

nonmovant]," *Grant*, 870 F.3d at 568.  However, the nonmovant "is not entitled to the benefit of

inferences that are supported by only speculation or conjecture."  *Nichols v. Mich. City Plant*

*Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (quotation marks omitted).

## II.      Analysis

In the complaint, Kelly alleges that The Project discriminated against her on the basis of

her race in two ways: first, the board voted to terminate her, and second, it failed to pay her a

salary similar to those of Caucasian executive employees of not for profit organizations, such as

Meirick, the Caucasian woman who replaced her as executive director.  Compl. 1–3.  Both of

these claims are brought under 42 U.S.C. § 1981, *id.*, which prohibits discrimination on the basis

of race in the making and forming of contracts, *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998,

1002 (7th Cir. 2013); *see* 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United

States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white

citizens . . . .").  "Employment suffices as a contractual relationship under [§] 1981."  *James v.*

*Get Fresh Produce, Inc.*, No. 18 C 4788, 2018 WL 6199003, at *7 (N.D. Ill. Nov. 28, 2018).

When evaluating a § 1981 claim of employment discrimination at summary judgment, a

district court must determine "whether the evidence would permit a reasonable factfinder to

conclude that the plaintiff's race . . . caused the discharge or other adverse employment action."

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).[3]  A plaintiff may cite to direct or

---

[3] In the Seventh Circuit, courts "generally apply the same standards to Title VII [of the Civil Rights Act of 1964]
and [§] 1981 race discrimination claims at the summary judgment stage."  *Smiley*, 714 F.3d at 1002; *see also James*,
2018 WL 6199003, at *8 ("[T]he substantive standards and methods of proof that apply to claims of racial
discrimination and retaliation under Title VII also apply to claims under § 1981.").  Thus, the Court cites to § 1981
and Title VII cases interchangeably.

circumstantial evidence of discrimination to show causation; examples of circumstantial

evidence that may "support an inference of intentional discrimination [include] ambiguous or

suggestive comments or conduct; better treatment of people similarly situated but for the

protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v.*

*Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).  "Evidence must be considered as a

whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ."

*Ortiz*, 834 F.3d at 765.  "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex.*

*Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).

   One method a plaintiff may use for "organizing, presenting, and assessing circumstantial

evidence" in discrimination cases is the burden-shifting framework created by *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which

>   the plaintiff has the initial burden of establishing that (1) she is a member of a
>   protected class, (2) she performed reasonably on the job in accord with her
>   employer['s] legitimate expectations, (3) despite her reasonable performance, she
>   was subjected to an adverse employment action, and (4) similarly situated
>   employees outside of her protected class were treated more favorably by the
>   employer;

the burden then shifts to the employer to "articulate a legitimate, nondiscriminatory reason for

the adverse employment action, at which point the burden shifts back to the plaintiff to submit

evidence that the employer's explanation is pretextual." *David v. Bd. of Trs. of Cmty. Coll. Dist.*

*No. 508*, 846 F.3d 216, 224–25 (7th Cir. 2017) (alteration in original) (quotation marks

omitted).[4]

---

[4] Although the Seventh Circuit previously distinguished "direct" from "indirect" evidence, *Andrews v. CBOCS W.,*
*Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), it subsequently abandoned this practice, *Ortiz*, 834 F.3d at 763–66.  While
acknowledging that employment discrimination cases are rarely straightforward, the Seventh Circuit found that
attempting to funnel the evidence in these often factually complex cases into categories was likely to complicate
matters.  *Id*. at 765.  As such, it instructed district courts to "stop separating 'direct' from 'indirect' evidence and

### a. Termination

The Project contends that it is entitled to summary judgment on Kelly's claim that the vote to terminate her employment constitutes race discrimination, arguing that she has neither satisfied her burden of establishing a *prima facie* case under the *McDonnell Douglas* framework nor shown that there is sufficient evidence in the record as a whole to demonstrate discrimination.  Def.'s Mot. Summ. J. 14–19; Def.'s Reply 5–8.  The Court will examine whether Kelly has satisfied her burden under either method.[5]

### i. *McDonell Douglas* Burden-Shifting Framework

Two of the four elements necessary to establish a *prima facie* case under the *McDonnell Douglas* framework are not in dispute: Kelly is a member of a protected class, and she was subjected to an adverse employment action when the board voted to terminate her.  To fulfill her initial burden, she must also show that she was meeting The Project's legitimate expectations at the time of the board's vote and that The Project treated similarly situated employees who were not African American more favorably.  *See David*, 846 F.3d at 225.

In assessing whether an employee was meeting an employer's legitimate expectations, "the inquiry must focus on [the employee's] performance at the time of his dismissal."  *Anders v. Waste Mgmt. of Wis., Inc.*, 463 F.3d 670, 676 (7th Cir. 2006).  Kelly admits that she used a company credit card to purchase tires, that she took over a month to repay The Project after

---

proceeding as if they were subject to different legal standards."  *Id*.  However, the Seventh Circuit continues to recognize the *McDonnell Douglas* burden-shifting framework as one method for presenting circumstantial evidence.  *David*, 846 F.3d at 224.

[5] It is unclear whether Kelly intends to present her argument using the *McDonnell Douglas* burden-shifting framework.  At one point in her response, she argues that summary judgment is not warranted because she can establish a *prima facie* case of race discrimination, indicating the *McDonnell Douglas* framework, Pl.'s Resistance Mot. Summ. J. 10, but she subsequently cites *Ortiz* to argue that the Court should look only to "whether the evidence would permit a reasonable fact finder to conclude that the plaintiff's race . . . caused the discharge," *id*. at 11 (quotation marks omitted).  In the interest of completeness, the Court will examine the evidence both under the *McDonnell Douglas* framework and more broadly.

becoming aware that the company card had been charged for the purchase, and that it is against

The Project's policies to use a company credit card for personal use.  Def.'s Mot. Summ. J. 7–8;

Pl.'s Resistance Mot. Summ. J. 4.  Her violation of company policy shows that she was not

meeting her employer's legitimate expectations.  *See, e.g.*, *Anders*, 463 F.3d at 676 (finding that

an employee was not meeting his employer's legitimate expectations because he attempted to

attack his manager in violation of his employer's code of conduct and workplace violence

policy).  In support of her argument that she *was* meeting The Project's legitimate expectations,

Kelly asserts that she "was never disciplined or reprimanded, nor did the board inform her of any

areas in which she needed to improve."  Pl.'s Resistance Mot. Summ. J. 8 (citing Kelly Dep.

41:8–15).  But because it is not disputed that she violated company policy, she cannot show that

she was performing adequately.  *Cf. Peters v. Renaissance Hotel Operating Co*., 307 F.3d 535,

545 (7th Cir. 2002) ("[T]he question is not whether at any time in [the employee's] employment

he was meeting his employer's expectations; the question is whether he was meeting his

employer's expectations at the time he was terminated.").

Likewise, Kelly has failed to show that similarly situated non-African American

employees were treated differently that she was.  "[W]hether employees are similarly situated is

a flexible, common-sense, and factual inquiry."  *David*, 846 F.3d at 225 (quotation marks

omitted).  The court should consider such factors as "whether the employees (i) held the same

job description, (ii) were subject to the same standards, (iii) were subordinate to the same

supervisor, and (iv) had comparable experience, education, and other qualifications—provided

the employer considered these latter factors in making the personnel decision."  *Id*. at 226

(quotation marks omitted).  If sufficient information is not provided, the court cannot find

employees to be comparable.  *See Anders*, 463 F.3d at 676–77 (affirming a grant of summary

judgment on a race discrimination claim where, while the employee claimed that "there were four white, comparable . . . employees who engaged in analogous acts of aggression, the record [wa]s devoid of any information as to the specifics of their actions, their supervisor, or any mitigating circumstances"). The burden of establishing that an employee was similarly situated—through citations to evidence—belongs to Kelly. *See David*, 846 F.3d at 225.

Kelly names Meirick as a similarly situated Caucasian employee. Pl.'s Resistance Mot. Summ. J. 11. Meirick held the position of executive director, the same job that Kelly had previously performed. But Kelly has provided no evidence to show that the two were comparably qualified: she cites only to the fact that Meirick received a salary of $80,000, while Kelly was paid $62,000 per year, *id*. at 7, 11. Furthermore, The Project cites in its reply to evidence showing that Meirick had substantially more experience than Kelly in overseeing an organization prior to assuming the position of executive director. It attaches an affidavit from Meirick stating that prior to becoming executive director of The Project, she served as the Manager of Hospital and Outpatient Operations for Genesis Health System, a position in which she oversaw up to 400 staff members and had a budget of over $40 million, which was "substantially higher than that of The Project at the time of [her] hiring." Meirick Aff. ¶ 4, Def.'s Reply Ex. 9, ECF No. 19-1. The Project asserts that, in contrast, Kelly was a substance abuse counselor prior to joining The Project and that, while executive director, she never supervised more than 15 or 16 employees. Def.'s Reply 1–2 (citing Kelly Dep. 8:2–9:14, 12:20–25).

Another possible comparator is Hansen, a non-African American employee who, Kelly testified, took inventory without permission and was not fired or disciplined, Kelly Dep. 31:2–21. However, Hansen was the director of grants and services and, as such, was under the

supervision of the executive director, not the board, as Kelly was, Def.'s Mot. Summ. J. 3, and

Kelly provides no other information about Hansen's job description or qualifications, thus failing

to satisfy her burden of showing that Hansen is an adequate comparator.  *See David*, 846 F.3d at

225–26.  No other potential comparators have been identified.  Kelly has not satisfied her burden

to establish a *prima facie* case of race discrimination based on the board's vote to terminate her.

### ii.  Evidence as a Whole

While Kelly has not established that the board's vote to terminate her was discriminatory

under the *McDonnell Douglas* framework, her claim may nonetheless survive summary

judgment if the evidence, considered as a whole, "would permit a reasonable factfinder to

conclude that the plaintiff's race . . . caused the discharge."  *See Ortiz*, 834 F.3d at 765.  Kelly

argues that she has met that standard.  Pl.'s Resistance Mot. Summ. J. 11–13.  She cites to three

pieces of evidence in support: first, the board failed to follow The Project's progressive

disciplinary policy by voting to terminate her rather than taking any action short of termination,

which indicates that the reason given for her termination was pretextual; second, two board

members—McCowan and Schmits—"told [her] after her termination that the board's motivation

for terminating her was racially discriminatory"; and third, "the two board members who pushed

for the investigation, Kopp and Stevens[,] had both made racially insensitive statements to

[Kelly] and about The Project," showing racial bias.  *Id.* at 12–13.

Kelly first contends that the board's failure to follow The Project's progressive

disciplinary policy shows pretext.  *Id*. at 12.  To establish pretext, a plaintiff must show more

than "just faulty reasoning or mistaken judgment on the part of the employer"; she must

demonstrate that the employer's proffered reason for terminating her was a "lie, specifically a

phony reason for some action."  *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389–90 (7th

Cir. 2020) (quotation marks omitted). "In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 505 (7th Cir. 2017) (alteration in original) (quotation marks omitted); *see also Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 754–55 (7th Cir. 2006) ("An employee's attempt to avoid summary judgment cannot succeed unless the employee puts forth evidence suggesting that the employer itself did not believe the proffered reasons for termination.").

Kelly testified that "[t]he discipline structure that [she] came up with was written warning, and that could happen multiple times; then [one] could get a three-day suspension or [one] could be terminated." Kelly Dep. 21:16–19. In contrast, she argues, the board voted to terminate her even though she had never been disciplined before. Pl.'s Resistance Mot. Summ. J. 8, 12. Undermining her argument, however, is that the evidence does not establish that Kelly herself was subject to the progressive disciplinary policy. A copy of the policy was not provided to the Court, and Kelly testified only that the procedures, which she wrote in 2015, were in place in case *she* had to fire anyone, Kelly Dep. 19:23–20:4, and that she, as executive director, along with Hansen and Hall, looked to the procedures when deciding how to discipline or reprimand employees, *id*. at 21:4–22:5. As executive director, Kelly was the only employee of The Project who answered directly to the board; she was the supervisor of every other employee. Def.'s Mot. Summ. J. 3. Nothing in the evidence provided suggests that the progressive disciplinary policy applied to Kelly. *Cf. Giacoletto v. Amax Zinc. Co*., 954 F.2d 424, 427 (7th Cir. 1992) (finding that the jury could have found pretext based on the employer's failure to follow its own procedures because, "[a]lthough [the employer's] witnesses claimed that the company never

12

applied these procedures to managerial personnel, the express language of the corporate policy statement indicated that the policy applied to [the plaintiff]"). The Court thus finds that this evidence is not relevant to a pretext analysis.

Kelly points next to statements allegedly made to her by two board members, which, she believes, prove racial motivation. In her deposition, Kelly testified that Schmits and McCowan both told her that they thought the board's decision was racially motivated.[6] Kelly Dep. 78:24–80:4. McCowan did, in fact, testify that she "felt like there were a lot of discussions outside of [her] presence" which "led [her] to believe that [the decision] was racially motivated," McCowan Dep. 36:6–8, Def.'s Mot. Summ. J. Ex. 4, ECF No. 17-4, but she did not explain why she believed that the existence of these hypothetical other discussions showed a racial motivation or provide any corroboration that they occurred. She also admitted that she never "hear[d] or receive[d] any documentation that would support that position." *Id*. at 36:9–12. And Schmits testified that there was "nothing that would have led [him] to believe" that the vote was racially motivated, Schmits Dep. 13:22–25, Def.'s Mot. Summ. J. Ex. 5, ECF No. 17-5, and that he did not believe that the board's vote to terminate Kelly was racially motivated, nor did he "have . . . any reason to say that the board's ending [Kelly's] employment was racially motivated," *id*. at 18:17–22. Kelly argues that Schmits's contradictory statements create a "disputed issue[] of material fact." Pl.'s Resistance Mot. Summ. J. 12–13. But even if both McCowan and Schmits had stated that they believed that the board's vote to terminate Kelly was racially motivated, this would show nothing more than a subjective belief that this is what occurred. *See Kizer v.*

---

[6] Kelly argues that this testimony is admissible pursuant to Federal Rule of Evidence 801(d)(2), as McCowan and Schmits were members of the board and, as such, were agents of The Project. *See* Pl.'s Resistance Mot. Summ. J. 12–13. Rule 801(d)(2) provides that a statement offered against an opposing party and "made by the party's agent . . . . on a matter within the scope of that relationship and while it existed" is not hearsay. Fed. R. Evid. 801(d)(2).

*Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) ("[A] subjective belief of discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination." (alteration in original) (quotation marks omitted)).  Furthermore, neither McCowan nor Schmits voted to terminate Kelly.

The final pieces of evidence to which Kelly cites to show discrimination—allegedly racially insensitive statements made by two board members—are circumstantial evidence that may be relevant to the inquiry.  *See Joll*, 953 F.3d at 929 (noting that "ambiguous or suggestive comments" can "support an inference of intentional discrimination").  It is not disputed that board member Stevens wrote a statement for a PowerPoint slide stating that The Project "ha[d] to find a way to move away from the ghetto-ized perception that just [wa]sn't a reality in 2016," Def.'s Mot. Summ. J. 6; Pl.'s Resistance Mot. Summ. J. 3, nor that when board member Kopp encountered Kelly with her hair worn naturally and not in a bun, she asked her, "That's the best you can do with that?" Def.'s Mot. Summ. J. 6 (quotation marks omitted); Pl.'s Resistance Mot. Summ. J. 3.  Kelly argues that these statements were racially insensitive and directed towards Kelly, raising a question of fact as to whether the termination was discriminatory, since Kopp and Stevens were the board members who "pushed for the investigation."  Pl.'s Resistance Mot. Summ. J. 13.

Even if these statements were racially insensitive, they are not sufficient to show that the board members who voted to terminate Kelly acted with discriminatory intent.  "Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."  *Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013); *see Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) ("[I]solated comments that are no more than stray remarks in the workplace are insufficient to establish that a

14

particular decision was motivated by discriminatory animus." (alteration in original) (quotation marks omitted)), *overruled on other grounds by Ortiz*, 834 F.3d 760.   Neither comment was made in connection with the February or April board meeting; Kelly's race was not mentioned during these meetings, Def.'s Mot. Summ. J. 10; Pl.'s Resistance Mot. Summ. J. 5.   Thus, the Court cannot infer from these comments that the board was racially motivated to terminate her.

All of the evidence, considered cumulatively, would not permit a reasonable factfinder to conclude that Kelly was terminated because of her race.[7]  *Cf. Ortiz*, 834 F.3d at 766 (finding that there was a genuine dispute as to whether an employee was terminated because of his Mexican ethnicity because there was evidence that the employee's managers repeatedly directed ethnic slurs at him, he was allegedly fired for engaging in a practice that was common at the company, and there was no express policy that forbid the practice).   The Project is entitled to summary judgment on Kelly's claim that the board's vote to terminate her constitutes discrimination based on race.

### b. Disparate Pay

In the complaint, Kelly also alleges that she was subjected to discrimination based on her race because The Project "fail[ed] to pay her a salary similar to those of Caucasian executive employees."  Compl. 2.   Although The Project states in its motion that it seeks summary judgment on Kelly's "race discrimination claim under 42 U.S.C. § 1981," Def.'s Mot. Summ. J. 2, it appears to address only her claim that her termination constitutes race discrimination, *id*. at 14–19, entirely failing to argue that the Court should grant summary judgment on the disparate pay claim as well.   *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment,

---

[7] In the complaint, Kelly further alleges that "The Project's actions towards [Kelly] were intentional and willful discrimination in that The Project had a history of disparately disciplining African American employees more severely than similarly situated non-African American employees."  Compl. 3.  Because she does not argue this point in her response to the motion for summary judgment, she has waived it.  *See Nichols*, 755 F.3d at 600.

*identifying each claim or defense—or the part of each claim or defense*—on which summary

judgment is sought." (emphasis added)).

Nonetheless, the Court is inclined to enter summary judgment in The Project's favor on

Kelly's disparate pay claim, which it may do pursuant to Federal Rule of Civil Procedure 56(f)

after providing for an opportunity to respond.  *See* Fed. R. Civ. P. 56(f)(3) ("After giving notice

and a reasonable time to respond, the court may consider summary judgment on its own after

identifying for the parties material facts that may not be genuinely in dispute.").  It is undisputed

that Meirick received a higher salary than Kelly.  *See* Def's Mot. Summ. J. 3; Pl.'s Resistance

Mot. Summ. J. 7.  But as the Court found above, Meirick and Kelly were not comparably

qualified, *see supra* II(a)(i), indicating that Kelly cannot prevail on her disparate pay claim

through a comparison between the two.  While the complaint also suggests that Kelly is alleging

a disparate pay claim based on the disparity between her salary and those of other executives

managing not for profit organizations, *see* Compl. 2 ("[Kelly] asked for a pay increase to an

annual salary of $72,000.00 which was commensurate with the compensation paid to executives

who manage not-for-profit organizations."), she has not identified any potential comparators in

this category.

The parties may submit additional briefs on this issue within 21 days of entry of this

Order.

## CONCLUSION

For the foregoing reasons, Defendant The Project of the Quad Cities, Inc.'s Motion for

Summary Judgment, ECF No. 17, is GRANTED to the extent it seeks judgment on Plaintiff

Wendy Kelly's claim that her termination constitutes race discrimination.  The parties may

submit additional briefs on whether the Court should grant summary judgment on Kelly's

disparate pay claim within 21 days of entry of this Order.  The Clerk is directed to VACATE the current dates for the final pretrial conference and the jury trial.

Entered this 21st day of April, 2021.

s/ Sara Darrow

SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE

17